David Mark PRUETT, Petitioner,

v.

Charles THOMPSON, Warden,
Respondent.

Civ. A. No. 3:90CV00667.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 19, 1991.

Curtis S. Hansen, Washington, D.C., for petitioner.

Robert H. Anderson, III, Office of Atty. Gen., Richmond, Va., for respondent.

## MEMORANDUM OPINION

SPENCER, District Judge.

This matter is before the Court on a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, and respondent's motion to dismiss a petition or for summary judgment. The parties have not sought a hearing, and the matter is ripe for disposition. For the reasons stated below, the respondent's motion will be granted and the petition dismissed.

I

This memorandum will use the following abbreviations:

| | | |
|---|---|---|
| Brief of Appellant | = | Pruett's direct appeal brief |
| State Hab.Pet. | = | State Habeas Petition |
| Am.State Hab.Pet. | = | Amended State Habeas Petition |
| State Hab.Order | = | Habeas trial court order of 7/14/88 |
| Pet. for Appeal | = | Petition for Appeal of trial court denial of habeas writ |
| Sup.Ct. Order | = | Virginia Supreme Court order of November 16, 1989, refusing petition for appeal |
| Trial Tr. [page] | = | Trial Transcript [page] |
| Hab. [Vol.] [page] | = | Transcript volume and page number, for trial court hearing on habeas petition; Vol. I refers to transcript of October 18, 1988 proceedings, Vol. II to October 19 proceedings |

Pruett was indicted in July 1985 for the rape, robbery and capital murder of Wilma L. Harvey. A jury convicted Pruett of all three charges and fixed his punishment for rape at life imprisonment, and for robbery at 75 years in prison. Pursuant to Virginia Code § 19.2–264.3, the same jury then heard evidence in aggravation and mitigation of the murder charge, and returned a sentence of death. The trial court imposed the sentences fixed by the jury.

The most obvious evidence of Pruett's guilt and the existence of aggravating factors came from his own confession, which the Virginia Supreme Court ably condensed. *See Pruett v. Commonwealth,* 232 Va. 266, 351 S.E.2d 1, 13 (1986), *cert. denied,* 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 706 (1987); *see also infra* discussion of Claim J. Pruett's confession was consistent with physical evidence at the scene, and testimony placing him at the victim's home the night of the murder.

Wilma Harvey was found with her hands tied so firmly behind her back that ligature marks remained on her arms and wrists. Trial Tr. V at 1077–78. A long sock was knotted tightly across her mouth and also knotted behind her head. It alone would have caused her death, because it pressed her tongue back in her mouth, blocking her airway. *Id.* at 1076.

Harvey had seven stab wounds to her neck, 12 to her chest, and one to her abdomen. Several slash wounds were grouped on her neck and her left hand. There were also cuts ranging from superficial to perforating, i.e., they passed through her entire body or limb. The stab wounds grouped around the neck penetrated her windpipe, major veins and arteries, and the floor of her mouth. *Id.* at 1069–75. Many of the individual stab wounds would have been fatal by themselves. *Id.* at 1075.

Wilma Harvey's body was found this way on her blood-soaked bed. Blood was found spattered in other places in her bedroom and adjacent bathroom. Trial Tr. IV at 926–30. There was no evidence of a forced entry. *Id.* at 930. Pruett's fingerprint was found on the inside of Harvey's glasses, and his palmprint was found on the headboard of Harvey's bed. *Id.* at 1000–01.

Shortly after his confession, Pruett consented to a search of his home. He also led police to assorted storm drains in the area, where police recovered defendant's T-shirt, underwear and pants, as well as silver coins he said he had taken from Harvey's home. *See id.* at 971–76.

Defendant's pants were found to have a semen stain on them from a "Type AB secretor," or a person with Type AB blood who tends to "express" blood type in other body fluids, such as semen. *See id.* at 1029, 1035. Pruett is a Type AB secretor. *Id.* at 1035.

Several items of Pruett's clothing were stained with blood consistent with Wilma Harvey's. *Id.* at 1044–53. Approximately 2.5% of the general population has the same blood type as Wilma Harvey had. *Id.* at 1053.

The Supreme Court of Virginia affirmed petitioner's convictions in all respects; it also denied a petition for rehearing, and the United States Supreme Court denied certiorari. *Pruett v. Commonwealth,* 232 Va. 266, 351 S.E.2d 1 (1986), *cert. denied,* 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 706 (1987). The United States Supreme Court later denied a petition for rehearing.

Pruett next filed a habeas corpus petition in the Circuit Court of the City of Virginia Beach, where he had been convicted. By order of June 14, 1988, the circuit court dismissed all petitioner's substantive allegations and some claims of ineffective assistance of counsel, and set a plenary hearing on the remaining ineffective assistance claims. The circuit court entered findings of fact and conclusions of law on March 6, 1989, and dismissed the petition in full by final order of March 27, 1989.

Pruett filed a petition for appeal raising most of the same allegations as the initial petition. The Virginia Supreme Court refused the petition, and the United States Supreme Court denied certiorari. —— U.S. ——, 110 S.Ct. 2194, 109 L.Ed.2d 522 (1990).

The facts will be discussed in more detail as the arguments warrant. First, however, the Court will summarize the claims in this petition, and the concepts of exhaustion and procedural default, which preclude this Court's review of all or part of many of the claims.

## II

*The Claims*

Pruett advances 12 arguments about the unlawfulness of his death sentence and/or conviction.[1] They are as follows:

A. Pruett's death sentence was based on impermissible evidence of victim impact and victim's character; any procedural default was caused by ineffective assistance of trial and appellate counsel.

B. Petitioner was denied a "competent and appropriate" pretrial psychiatric evaluation; any procedural default was caused by ineffective assistance of trial and appellate counsel.

C. The death sentence was based on extraneous, unreliable and irrelevant information purportedly offered to support non-statutory aggravating circumstances; any procedural default was caused by ineffective assistance of trial and appellate counsel.

D. Trial court improperly denied requested jury instruction on the lesser-included offense of first-degree murder; any procedural default was caused by ineffective assistance of trial and appellate counsel.

E. Penalty phase instructions were insufficient to guide jurors in performing their sentencing duties, in that the court:

1) failed to instruct the jury it must unanimously find at least one aggravating circumstance to impose death;

2) failed to instruct on the definition of mitigation generally;

3) failed to instruct on specific mitigating circumstances listed in Virginia Code § 19.2–264.4(B) that were supported by evidence;

4) failed to instruct on the nonstatutory mitigating circumstances supported by evidence;

5) failed to instruct adequately on the definition of outrageously or wantonly vile, horrible, or inhuman as an aggravating circumstance;

6) failed to instruct that the jury must consider mitigating evidence;

7) failed to instruct that "the defendant need not prove mitigating evidence beyond a reasonable doubt;"

8) improperly submitted a verdict form which did not inform the jury that it had

---

**1.** Unless otherwise stated, all claims invoke the eighth and fourteenth amendments to the Con-     stitution.

to unanimously find at least one aggravating circumstance beyond a reasonable doubt; and

9) improperly submitted a verdict form which did not provide for the consideration of mitigating circumstances supported by the evidence.

Any procedural default was caused by ineffective assistance of trial and appellate counsel.

F. Prosecutorial misconduct denying Pruett due process of law, and rendering the sentencing unreliable, in violation of the sixth, eighth and fourteenth amendments, in that the prosecutors:

1) asked during voir dire whether the prospective juror would hold the Commonwealth to a higher burden than reasonable doubt, based on the possibility of a death sentence, to the jury panel's confusion;

2) improperly discussed plans to introduce evidence of aggravating circumstances during the sentencing phase, even before the guilt phase of trial had commenced;

3) improperly discussed the victim's character in the same opening statement;

4) later offered the victim's husband's testimony as to the victim's character, during the guilt phase of trial;

5) referred to such evidence during closing arguments, and claimed Pruett butchered the victim solely to eliminate her as a witness, "despite the absence of any evidentiary support for this conclusion;"

6) argued to the jury that Pruett conceded guilt at voir dire;

7) argued at the rebuttal closing that the jury should show Pruett the same mercy he showed the victim, implying that "because the victim received no trial rights, [Pruett] was not entitled to those rights either," and calling on the jury to compare the relative worth of Pruett's life and the victim's;

8) called during sentencing the husband of a former alleged victim to testify to how his wife was killed;

9) argued at closing of sentencing that death by electrocution was appropriate simply because Pruett was convicted, and generally "intrud[ed] on the precise function for which the jury was empaneled;"

10) commented at sentencing on Pruett's lack of remorse for and the heinousness of both the murder at issue, and the prior unadjudicated murder;

11) argued that the jury need not consider mitigating evidence in sentencing, and that Pruett would present a danger to guards and others if he was jailed instead of executed;[2] and

12) argued again that Pruett did not deserve to rely on mitigating evidence, or argue for an alternative to death, because the victim had no such opportunity.

Any procedural default was caused by ineffective assistance of trial and appellate counsel.

G. Ineffective assistance of trial and appellate counsel generally, in that counsel:

1) had never defended a capital case before;

2) failed to adequately investigate sources of evidence for guilt phase defenses, focusing instead on suppression of Pruett's statements to law enforcement authorities;

3) directed the jury's attention to identify with Pruett's parents, while failing to direct them to mitigating evidence;

4) failed to adequately investigate potential mitigating evidence, including Pruett's enrollment in a substance abuse program in 1981, and related evidence of severe alcohol and drug dependency;

5) failed to conduct "an independent investigation of ... how being the older sibling of two handicapped children might have affected" Pruett;

6) failed to fully discuss with Pruett's court appointed forensic psychologist Dr.

**2.** The trial court sustained an objection to this argument and gave a cautionary instruction about this.

Thomas Tsao the assorted mitigating factors which could be relevant, "considering the diverse frailties of human kind;"

7) failed to "confirm, deny or modify [Pruett's] social history" as told to Tsao during the doctor's "single one to two hour interview" with him, based on "only a few very limited materials" as background for the doctor's evaluation;

8) failed to provide Tsao with reports of "problematic episodes" Pruett's parents had discussed with counsel;

9) failed to obtain Pruett's medical or counselling records;

10) failed to discuss with Tsao the possibility that Pruett may have been adversely affected psychologically or otherwise by virtue of (a) the death of his son shortly after his return from overseas military service, (b) the break-up of his marriage, or (c) the financial stresses of his gambling;

11) failed to consult with Tsao about Pruett's various versions of his life which he [counsel] believed to be manufactured and untruthful, despite having learned from [Pruett's father] that [Pruett] had difficulty with truth-telling;

12) failed to discuss numerous other developmental problems Pruett apparently had, which could have supported mitigating circumstances such as imperfect heat of passion and reduced culpability;

13) failed to present evidence in support of his motion for a second appointed psychiatrist;

14) failed to consult with Tsao regarding consideration of aggravating circumstances of future dangerousness in prison;

15) failed to do a variety of things supposedly required in competent voir dire and opening argument;

16) failed to examine or cross-examine officers about "the crucial issue" of voluntariness of Pruett's initial confession during police interrogation;

17) failed to object to evidence produced from a warrantless search of Pruett's house on grounds Pruett was incapable

of knowingly waiving his fourth amendment rights by consent;

18) told the jury Pruett "wasn't a human being," whom the jury would not be able to understand;

19) conceded the existence of aggravating circumstances during the sentencing phase opening;

20) introduced only Pruett's parents as witnesses;

21) failed to request appropriate penalty phase jury instructions;

22) failed to request a verdict form listing both aggravating and mitigating circumstances supported by evidence and requiring the finding of aggravating circumstances unanimously and beyond a reasonable doubt and mitigating circumstances only by a plurality and a preponderance of the evidence;

23) denied the possibility that Pruett might adapt to incarceration and pose no future danger; and

24) failed "to adequately raise, brief, or argue at trial any of the claims in this petition."

In addition, the state court's limited evidentiary hearing on petitioner's ineffective assistance claims at the habeas proceeding "was not full and fair."

H. Pruett was denied the right to sentencing before a jury on the capital murder charge after a guilty plea, in violation of the sixth, eighth and fourteenth amendments, because:

1) the trial court overruled his motion to plead guilty to the charges against him and have a jury empaneled only on the sentencing for the murder;

2) Pruett did not enter his not guilty plea freely and voluntarily, because this motion was denied; and

3) this confused the jury because of the perception that Pruett "was contesting his guilt by pleading not guilty, in spite of his failure to put on any defense at the guilty phase of trial."

Any procedural default was caused by ineffective assistance of trial and appellate counsel.

I. Pruett was denied the right to select an impartial jury in violation of the

sixth, eighth and fourteenth amendments, because:

1) prospective juror Alfred Friedman stated he would "lean toward" the death penalty, given the circumstances which counsel and the court said would confront jurors in the case;

2) the court denied Pruett's motion to excuse Friedman for cause, incorrectly relying on the *Witherspoon v. Illinois*, 391 U.S. 510[, 88 S.Ct. 1770, 20 L.Ed.2d 776] (1968) standard rather than the *Wainwright v. Witt*, 469 U.S. 810[, 105 S.Ct. 70, 83 L.Ed.2d 20] (1985) standard for excusal for cause; which

3) forced defense counsel to strike Friedman with a peremptory challenge, in violation of his purported right to have Friedman excused for cause under *Ross v. Oklahoma*, 487 U.S. 81[, 108 S.Ct. 2273, 101 L.Ed.2d 80] (1988).

Pruett notes the Virginia Supreme Court ruled this claim collaterally estopped.

J. Pruett's confession was introduced in violation of his fourth, fifth, sixth and fourteenth amendment rights, because:

1) he was in police custody when he first confessed to the rape, robbery and murder of Wilma Harvey;

2) he was not informed of his rights under *Miranda v. Arizona*, 384 U.S. 436[, 86 S.Ct. 1602, 16 L.Ed.2d 694] (1966);

3) he was under the influence of drugs and alcohol, and was continuing to suffer from a mental illness brought on by his return from military service in Vietnam in 1971, rendering him "unable to distinguish truth from fantasy," or to intelligently waive his fifth amendment rights; and

4) the police officers' interrogating techniques were coercive, rendering his confession involuntary;

Pruett notes the Virginia Supreme Court ruled this claim collaterally estopped.

K. Pruett was precluded from developing and presenting mitigating evidence because:

1) Dr. Tsao failed to provide him with competent psychiatric assistance generally;

2) Dr. Tsao failed to evaluate Pruett specifically for the presence of post-traumatic stress disorder resulting from his "full military and combat experience" in Vietnam; and

3) because he was denied the opportunity to have a jury sentence him but enter a guilty plea to the offense, all such preclusions in violation of *Lockett v. Ohio*, 438 U.S. 586[, 98 S.Ct. 2954, 57 L.Ed.2d 973] (1978) and its progeny.

Any procedural default was caused by ineffective assistance of trial and appellate counsel.

L. It is cruel and unusual punishment to sentence a mentally ill person like Pruett to death.

*Procedural Default and Exhaustion*

Many of petitioner's claims are wholly or partly barred by procedural default. Petitioner misconstrues the application of this doctrine to his petition.

■ This Court can of course issue a writ of habeas corpus only if Pruett's confinement is in violation of the federal Constitution or laws. 28 U.S.C. § 2241(c)(3). Pruett must also have exhausted all state court remedies available, absent certain circumstances not present or argued here. 28 U.S.C. § 2254(b). This requirement is strictly enforced, in the interests of giving the state courts the first opportunity to consider and, if necessary, correct the alleged constitutional errors in a person's conviction and sentencing. *E.g., Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

■ Exhaustion generally requires that the essential legal theories and factual allegations advanced in federal court be the same as those advanced at least once to the highest state court. *See, e.g., Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Clanton v. Muncy*, 845 F.2d 1238, 1241 (4th Cir.1988); *Wise v. Warden*, 839 F.2d 1030, 1033–34 (4th Cir.1988); *see also Daye v. Attorney*

*General,* 696 F.2d 186 (2d Cir.1982) (en banc) (discussing exhaustion generally), *discussed with approval in Thornton v. Holland,* 789 F.2d 917 (4th Cir.1986) (unpublished).

■ So-called "mixed petitions," i.e., those containing both exhausted and unexhausted claims, must ordinarily be dismissed to allow the state courts to consider the unexhausted claims. *Rose v. Lundy,* 455 U.S. at 522, 102 S.Ct. at 1205. The exception [3] is when the petitioner has no available state remedy left, because it is clear the state would deny review on the basis of some procedural bar, as discussed *infra.* *E.g., Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989); *see Meadows v. Legursky,* 904 F.2d 903, 909 (4th Cir.1990) (en banc) (otherwise unexhausted claim deemed exhausted unless "reasonable possibility exists" that state court may apply an exception to its procedural default rules), *cert. denied,* —— U.S. ——, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990).

Even when this exception applies, the federal court must still dismiss those claims or portions of claims which either (1) have been explicitly ruled procedurally barred by the highest state court considering the claims, or (2) are not exhausted but would clearly be procedurally barred [4] if returned to state court. *See, e.g., Bassette v. Thompson,* 915 F.2d 932, 935–37 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991); *Whitley v. Bair,* 802 F.2d 1487, 1496–1502 (4th Cir. 1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987).

■ In Virginia, the basic procedural bar rule is a simple one: no writ will be granted on the basis of any legal or factual claim the petitioner could have made previously, but did not. *See Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied,*

419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975); Va.Code Ann. § 8.01–654(B)(2).

■ As indicated above, the rule will be given effect under two circumstances. One situation is where the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on the procedural bar. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 1068, 103 L.Ed.2d 334 (1989) (quoting *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)); *Bassette,* 915 F.2d at 936. Another arises when a claim was never presented to the state courts to begin with, and the state procedural bar rule would clearly bar consideration of the new allegations. *Teague,* 109 S.Ct. at 1068–69; *Bassette,* 915 F.2d at 937.

■ The Virginia procedural bar is strictly enforced in state courts, and by the courts of the Fourth Circuit. *See Bassette,* 915 F.2d at 937; *Clanton v. Muncy,* 845 F.2d 1238 (4th Cir.), *cert. denied,* 485 U.S. 1000, 108 S.Ct. 1459, 99 L.Ed.2d 690 (1988).

■ A procedural bar may exist based on default at trial, *e.g., Bond v. Procunier,* 780 F.2d 461 (4th Cir.1986), on direct appeal, *e.g., Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), or any stage of post-conviction proceedings, *e.g., Murch v. Mottram,* 409 U.S. 41, 93 S.Ct. 71, 34 L.Ed.2d 194 (1972); *Waye v. Murray,* 884 F.2d 765 (4th Cir.1989); *see Whitley v. Bair,* 802 F.2d at 1498 & n. 19.

■ There are only two ways to avoid the effect of a procedural bar or default. The first is to show "cause and prejudice" for the default. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ The Supreme Court has never attempted to give these terms a precise definition. *Reed v. Ross,* 468 U.S. 1, 13, 104 S.Ct. 2901, 2909, 82 L.Ed.2d 1 (1984).

---

**3.** There are other exceptions, which do not appear applicable here. *See Granberry v. Greer,* 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987) (state waiver of exhaustion requirement); *Patterson v. Leeke,* 556 F.2d 1168 (4th Cir.) (discussing ineffectiveness of state remedy due to

inordinate delay), *cert. denied,* 434 U.S. 929, 98 S.Ct. 414, 54 L.Ed.2d 289 (1977).

**4.** And thus also deemed exhausted. *See Meadows,* 904 F.2d at 909.

But "cause" exists in at least the following circumstances:

(1) Where a constitutional claim is "so novel that its legal basis is not reasonably available to counsel" at the time of the default. *Reed v. Ross,* 468 U.S. at 16, 104 S.Ct. at 2910.

A claim is not so novel, however, if "various forms of the claim had been percolating in the lower courts for years." 17A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4266.1 at p. 460 & n. 48 (1988); *see Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 2666–68, 91 L.Ed.2d 434 (1986).

(2) Where counsel is responsible for the default through a mistake of such magnitude that it amounts to ineffective assistance of counsel under the strict standards announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986).

An ineffective assistance claim is itself subject to exhaustion and procedural default barriers, however. *See id.* at 488–89, 106 S.Ct. at 2645–46.

Furthermore, cause need not be shown in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496, 106 S.Ct. at 2649.

■ Both cause *and* prejudice must be shown. *See Engle v. Isaac,* 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 1575 n. 43, 71 L.Ed.2d 783 (1982). Prejudice must be evaluated in the total context of the trial, and is present only if petitioner can show that the errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (original emphasis).[5]

Pruett insists that he has not procedurally defaulted, because the Virginia Supreme Court did not clearly and expressly state its reliance on a state procedural bar. *Harris v. Reed,* 109 S.Ct. at 1045. In a related argument, he notes that this order found many of the claims raised in the petition for appeal both repetitious under *Hawks v. Cox,* 211 Va. 91, 175 S.E.2d 271 (1970)[6] and procedurally barred under *Slayton v. Parrigan.* He argues both cannot logically be true, and that this order must be viewed as a ruling that the federal constitutional claims now before this Court were fully presented to the state courts. This is wrong.

It is perfectly acceptable for a state court to issue *alternative* holdings—one on the merits and one on a procedural basis. *See Harris v. Reed,* 109 S.Ct. at 1044 n. 10. All that is necessary is an order which "shows precisely how the Court dealt with the petition for appeal." *Coleman v. Thompson,* 895 F.2d 139, 143 (4th Cir. 1990), *aff'd,* —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Nothing in *Harris* prohibits this Court from examining the record and the entire context of the Virginia Supreme Court order at issue to divine the scope of its statement. In *Coleman,* for example, the Virginia high court issued an order which stated only that the court had considered the opposing briefs on the issue of dismissal; it

---

5. *See also Harris v. Dugger,* 874 F.2d 756 (11th Cir.1989) (prejudice arose from counsels' failure to present or investigate mitigating evidence in capital case where there was "reasonable probability" jury would have recommended life rather than execution if presented with proffered evidence that defendant's family would have testified favorably to his character and lack of evidence that defendant entered victim's home with intent to kill), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989); *Cook v. Lynaugh,* 821 F.2d 1072 (5th Cir.1987) (prejudice shown where counsel's objection to using void conviction to enhance sentence would definitely have reduced sentence by half).

6. *Hawks* is essentially a rule of collateral estoppel as applied to habeas writs. It indicates Virginia courts will not issue a writ by reconsidering a claim previously made and rejected on direct appeal.

Respondent concedes that the *Hawks* rule does not bar this Court from considering those portions of petitioner's claims raised on direct appeal and at each level of the collateral proceedings. *See Baird v. Murray,* 885 F.2d 864 (4th Cir.1989) (unpublished).

concluded that "the motion to dismiss is granted and the petition for appeal is dismissed." *Coleman*, 895 F.2d at 143 n. 1.

The district court noted that the state's argument for dismissal was based on the petitioner's untimely filing of a petition for appeal. The Fourth Circuit affirmed the court's recognition of the procedural bar. *Id.* at 143; *see also Waye v. Murray*, 884 F.2d at 766–67 (noting Virginia Supreme Court order held claims procedurally barred for more than one reason, and enforcing the procedural bar as to newly raised portion of petitioner's claims).

Here, the Virginia Supreme Court order which petitioner claims to be ambiguous states:

> Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of an appeal, we apply the rule in *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974), to appellant's assignments of error (a) through (f), (h), (j), (k) and (*l*); the rule in *Hawks v. Cox*, 211 Va. 91, 175 S.E.2d 271 (1970), to appellant's assignments of error (a), (b), (c), (e), (i), (j) and (k); and finding no merit in assignment of error (g), the Court is of opinion there is no reversible error in the judgment complained of. Accordingly, the Court refuses the petition for appeal.[7]

Petitioner seizes upon the words "no reversible error" and says this indicates the absence of a clear statement of procedural default. But an examination of the order as a whole, especially in light of the arguments advanced in opposition to the petition and in light of the trial court order below, shows that the court did expressly and plainly rely on procedural rules to deny review.

Petitioner's argument about the logical inconsistency between a finding of repetition and procedural default is also meritless. A single general constitutional claim may of course consist of many different subpart allegations, some of which have been raised previously (and would thus be barred from further Virginia court review by *Hawks v. Cox*), and some of which have never been raised or have been raised but later abandoned (and thus barred from Virginia court or subsequent federal review by *Slayton v. Parrigan*). *Cf. Whitley v. Bair*, 802 F.2d at 1496 n. 17 (examining particular allegations within claims for procedural default).

With these principles in mind, the Court will review the apparent procedural defaults as relevant to each claim.

### III

*Claim A: Victim's Impact*

■■■ This now states no federal constitutional claim, in light of *Payne v. Tennessee*, — U.S. —, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

There, the Supreme Court overruled the seminal cases of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) and *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), which had held that admission of evidence or prosecutor's statements as to the crime's impact on the victim during the sentencing phase of capital trials were *per se* violations of the eighth amendment.

After deciding that such evidence or statements are relevant to the question of the defendant's blameworthiness, the Supreme Court concluded, "[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argu-

---

7. One could argue that the state habeas trial court orders are the final judgments to examine for presence of a "plain statement" of reliance on a procedural bar, because the Virginia Supreme Court's denial of a petition for appeal is simply a refusal to hear an appeal, rather than a judgment. *See Felton v. Barnett*, 912 F.2d 92, 94–95 (4th Cir.1990) (applying plain statement rule to North Carolina trial court judgment, rather than N.C. Supreme Court's denial of cer-

tiorari), *cert. denied*, — U.S.—, 111 S.Ct. 693, 112 L.Ed.2d 683 (1991).

Both sides assume, however, that the denial of a petition for appeal is the relevant final state court judgment. The Court will do the same. If this assumption is wrong, it works no prejudice to Pruett, because the habeas trial court orders here are even more precise about how each element of the claims advanced were barred.

ment on that subject, the Eighth Amendment erects no *per se* bar..... There is no reason to treat such evidence differently than other relevant evidence is treated." *Payne*, 111 S.Ct. at 2609.

*Claim B: Denial of Competent Psychiatric Evaluation*

■ This presents no ground for collateral relief, because it clearly seeks application of a new constitutional rule, within the meaning of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

There, the Supreme Court held that a habeas petitioner could not claim his trial was unconstitutional for violation of the rule in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),[8] where his trial was held before the *Batson* decision. *Teague*, 109 S.Ct. at 1066–67.

The Court also expounded at length on how to determine whether a case announces a new constitutional rule:

In general ... a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Id.* at 1070 (citations omitted, emphasis in original).

Such rules "should always be applied retroactively to cases on direct review, but ... generally they should not be applied retroactively to criminal cases on collateral review." *Id.* at 1071.

In substantially adopting the views of Justice Harlan in a separate opinion in *Mackey v. United States*, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971), the Court noted:

Justice Harlan identified only two exceptions to his general rule of nonretroactivity for cases on collateral review. First, a new rule should be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." Second, a new rule should be applied retroactively if it requires the observance of "those procedures that ... are 'implicit in the concept of ordered liberty.' "

*Id.* 109 S.Ct. at 1073 (citations omitted). That second exception should be reserved only for "watershed rules of criminal procedure." *Id.* at 1075. Such rules are those that involve procedures "central to an accurate determination of innocence or guilt," and "implicit in the concept of ordered liberty." *See id.* at 1077; *see also Sawyer v. Smith*, —— U.S. ——, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990) (second exception applies only if new rule necessary to accuracy of trial, *and* alters understanding of "bedrock procedural elements" essential to fairness).

The Court held that the *Batson* case did not fall within either exception to the general rule of nonretroactivity. *See also Sawyer*, 110 S.Ct. at 2831–33 (*Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) bar on prosecutor's improper capital penalty phase arguments not available retroactively on habeas); *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (alleged unconstitutionality of "antisympathy" instruction in death penalty sentencing phase would create new rule which cannot be retroactively applied); *Bassette v. Thompson*, 915 F.2d at 937–39 (constitutional claims attacking custodial interview by probation and parole officer and admission of psychiatric testimony offered by defense were based on new rules not entitled to retroactive appli-

---

**8.** *Batson* declared that a criminal defendant can establish a prima facie case of racial discrimination in jury selection if he shows (1) that he is a member of a cognizable racial group, (2) that the prosecutor exercised peremptory challenges to remove members of his race from the jury venire, and (3) that those facts and other circumstances raise an inference of unlawful racial exclusion. *Batson*, 476 U.S. at 96, 106 S.Ct.

at 1723; *see Powers v. Ohio*, —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (overruling *Batson* to extent it required defendant and removed panel member to be of same race).

Previously, the defendant's burden was to show a pattern of such peremptory strikes based on race, in "case after case." *See Swain v. Alabama*, 380 U.S. 202, 223, 85 S.Ct. 824, 837, 13 L.Ed.2d 759 (1965).

cation); *cf. Evans v. Muncy*, 916 F.2d 163, 165–66 (4th Cir.) (vacating stay of execution based on claim that constitution bars execution of defendant when behavior subsequent to sentencing casts doubt on whether aggravating factor supporting death sentence exists), *cert. denied*, —— U.S. ——, 111 S.Ct. 309, 112 L.Ed.2d 295 (1990).

Other than a due process/entitlement argument discussed briefly below, there is slim support for the constitutional rule of "denial of competent and appropriate pretrial psychiatric evaluation" which petitioner advances. Petitioner in fact appears to concede that, if his argument is accepted other than on state-law entitlement grounds, it would constitute a "new rule." *See* Petitioner's Reply in Opposition to the Commonwealth's Motion to Dismiss and Brief in Support at 13.

The Fourth Circuit has, in dictum, rejected the adoption of any such rule in a case where a petition was based in part on a theory of inadequate performance of a court-appointed psychiatrist:

> [W]e think that no such rule should be inaugurated, even in a capital case. It will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another and to procure an affidavit to that effect from the second prospective witness. To inaugurate a constitutional or procedural rule of an ineffective expert witness in lieu of the constitutional standard of an ineffective attorney, we think, is going further than the federal procedural demands of a fair trial and the constitution require.

*Waye v. Murray*, 884 F.2d 765, 766–67 (4th Cir.1989).[9]

At least one court has expressly held that a habeas claim based on alleged incom-

petence of state-appointed psychiatrists would invoke a new rule not entitled to retroactive application. *Harris v. Vasquez*, 913 F.2d 606, 622–25 (9th Cir.1990); *see also Jackson v. Ylst*, 921 F.2d 882, 885–86 (9th Cir.1990) (proposed rule requiring appointment of expert on eyewitness identification a new one which would not be retroactively applied); *Bassette v. Thompson*, 915 F.2d at 938–39 (*Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) rule requiring psychiatric assistance for defendant where state presents psychiatric evidence of future dangerousness not to be applied retroactively).

The due process argument invokes *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) and *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Petitioner claims that Virginia Code §§ 19.2–169.1 and 19.2–264.3:1 grant him an entitlement to psychiatric assistance, and that due process "stand[s] for the unremarkable proposition that a state may not create an entitlement, and thereby a due process interest, and then deny the entitlement arbitrarily." He claims that Dr. Tsao's ineffective assistance arbitrarily denied him his entitlement without notice and a hearing. This misconstrues the statutes and the principles of due process, as well as the facts of this case.[10]

A criminal defendant has no constitutional or Virginia state law right to a psychiatrist of his own choosing, or to "shop around" at state expense for experts who will present the most advantageous opinions possible. *Pruett v. Commonwealth*, 351 S.E.2d at 7 (citing cases); *accord Satterfield v. Zahradnick*, 572 F.2d 443, 445 (4th Cir.), *cert. denied*, 436 U.S. 920, 98 S.Ct. 2270, 56 L.Ed.2d 762 (1978); Va.Code Ann. § 19.2–264.3:1(A) (1990 Repl.

---

**9.** The court in *Waye* decided the case on procedural bar aspects, but also opined that the petition was "without substantive merit." *Waye*, 884 F.2d at 767.

**10.** It also appears to be procedurally barred. Petitioner argued on direct appeal only that the trial court abused its discretion under the applicable Virginia statutes to appoint a second psychiatrist. *See* Brief of Appellant at 20.

Petitioner argues there is no default, because the claim is "akin to a claim of ineffective assistance of counsel," which cannot be expected to be raised at trial or on direct appeal. There is no facial logic to this argument, especially given the fact that petitioner *did* address the failure to appoint another psychiatrist, albeit without a constitutional argument, on direct appeal.

Vol.) ("The defendant shall not be entitled to a mental health expert of the defendant's own choosing or to funds to employ such expert.").

Both statutes petitioner cites require, under certain circumstances, only the appointment of one or more psychiatrists *generally qualified* in forensic evaluation. *See* Va.Code Ann. §§ 19.2–169.1(A), 19.2–264.-3:1(A). Petitioner has never argued that Dr. Tsao was not generally qualified to evaluate him. He claims only that there were *better* qualified psychiatrists available, or that other psychiatrists would have rendered opinions more helpful to his defense, especially as to his ability to deliberate and his future dangerousness.

Petitioner also cites no case law or statutory construction for the proposition that the statutes entitle him to more than one generally qualified psychiatrist.[11] Thus, even the entitlement theory would amount to a new rule, because it is not *dictated* by existing precedent, and would not afford a basis for habeas relief.

The dictum of *Waye* of course also supports a holding that Claim B is without legal merit. *See also Harris v. Vasquez,* 913 F.2d at 622–63; *Silagy v. Peters,* 905 F.2d 986, 1013 (7th Cir.1990) (allegedly incompetent diagnosis by appointed psychiatrists states no *Ake* claim), *cert. denied,* —— U.S. ——, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). *But cf. Buttrum v. Black,* 721 F.Supp. 1268, 1312–13 (N.D.Ga. 1989) (contrary dictum in holding there was *Ake* violation where trial psychiatrists, who initially examined defendant only for competency, were not allowed to conduct further examination relevant to future dangerousness after prosecution put on expert testimony on same issue), *aff'd,* 908 F.2d 695 (11th Cir.1990).

*Claim C: Unreliable and Irrelevant Sentencing Factors*

■ During the sentencing phase, the Commonwealth introduced over Pruett's objections the following evidence: (1) portions of a videotaped confession in which petitioner admitted to the killing of Deborah McInnis, a previously unadjudicated homicide, (2) testimony from McInnis's husband, Larry, about the gory condition of her body and the blood surrounding it when she was found, and (3) an autopsy photograph of McInnis, displaying her multiple stab wounds in the neck.

Pruett now claims his confession was "too unreliable" to support the aggravating circumstance of future dangerousness; that information about the prior unadjudicated crime generally is irrelevant to such an issue; and that the information improperly focused the jury's attention on the "extraneous and highly prejudicial factor of the heinousness of the prior unadjudicated crime."

Once again, part of this claim seeks to create a "new rule" which cannot apply to this habeas proceeding. The only case petitioner offers to support his principle contention of constitutional irrelevance is *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Specifically, he relies on the following dictum from the case:

> [I]f an invalid statutory aggravating circumstance were supported by material evidence not properly before the jury, a different case would be presented. We need not decide in this case whether the death sentence would be impaired in other circumstances, for example, if the jury's finding of an aggravating circumstance relied on materially inaccurate or misleading information.

*Zant,* 462 U.S. at 887 n. 24, 103 S.Ct. at 2748 n. 24.

As far as holding, therefore, *Zant upheld* the death penalty of a petitioner where the evidence sustained the jury's finding of two valid aggravating circumstances, even though there was evidence and instruction introduced as to a third aggravating circumstance held to be inval-

---

**11.** The two due process cases petitioner cites of course only mandate notice and an opportunity to be heard when a state proposes to *take away* a state law entitlement. *See Bell v. Burson,* 402 U.S. at 539–42, 91 S.Ct. at 1589–91 (hearing required before automatic suspension of drivers license of uninsured motorists involved in accident); *Goldberg v. Kelly,* 397 U.S. at 269–71, 90 S.Ct. at 1021–22 (1970) (same for termination of certain government benefits).

id.[12] The dictum quoted above is also inapplicable; Pruett does not suggest that future dangerousness is an invalid statutory aggravating circumstance, or that the evidence presented was inaccurate or misleading.

Courts have uniformly rejected the argument that evidence of prior unadjudicated crimes is irrelevant to future dangerousness. *See Richardson v. Johnson,* 864 F.2d 1536, 1541 (11th Cir.) (discussing cases), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3175, 104 L.Ed.2d 1037 (1989); *Pruett v. Commonwealth,* 351 S.E.2d at 12. The result may of course differ if the evidence presented is plainly unreliable, *see Richardson,* 864 F.2d at 1541, but there is no indication in the record that any of the evidence Pruett complains about was so unreliable.[13]

*Claim D: Denial of Requested Instruction on First Degree Murder*

■ In his state court habeas petition, as amended, petitioner raised this claim based on a single argument—that the evidence did not support any finding that he raped Wilma Harvey.[14] *See* State Hab.Pet. at paras. 45–49. He also alleged the claim was not raised on direct appeal due his trial counsel's ineffective assistance. *See* Am. Pet. at para. 220.

His claim before this Court reflects one first made in state court on collateral *appeal*—that the nature of the killing and the nature of the petitioner would have supported finding that petitioner did not or could not have premeditated and deliberated over the killing.

It is not surprising that the Virginia Supreme Court found this entire claim procedurally defaulted under *Parrigan.* Although the ineffective assistance claim may have served as an allegation of cause and prejudice for failure to raise the "no rape or force" argument on direct appeal, petitioner has defaulted on the current Claim D because it was not even raised in the state habeas petition. *See Coleman v. Thompson,* 895 F.2d 139, 144 (4th Cir. 1990), *aff'd,* —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Even if petitioner could rely here on the "actual innocence" exception to procedural default,[15] there are several reasons why the exception is inapplicable here.

■ First, the exception is reserved for cases of *actual* innocence, not the sort of "legal" innocence represented by an argument as to the propriety of the jury charge. *See Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649. It does not apply where the claimed constitutional error "neither precluded the development of true facts nor resulted in the admission of false ones." *Smith v. Murray,* 477 U.S. at 538, 106 S.Ct. at 2668.

The actual innocence exception is at this point only theoretical. To date, no court has ever found the exception applicable. *Gilmore v. Armontrout,* 861 F.2d 1061, 1066 (8th Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989); *Simmons v. Lockhart,* 709 F.Supp. 1457, 1468 (E.D.Ark.1989); 17A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4266.1 at p. 467 (1988).

Second, there was certainly no "error" in failing to instruct as to first-degree murder, because if the facts supported finding

---

**12.** Significantly, Pruett conceded on direct appeal that the jury found against him on both future dangerousness and vileness of the offense. *Pruett v. Commonwealth,* 351 S.E.2d at 11 n. 7. He does not change his position here. The evidence as to the rape, robbery and murder of Wilma Harvey was clearly sufficient to support a finding of vileness. *See id.* at 13.

**13.** *See infra* for discussion of involuntary confession claim. To the extent Pruett claims that the evidence dealt with non-statutory aggravating factors, he raises only a state law claim. *See Barfield v. Harris,* 719 F.2d 58, 61 (4th Cir.1983) ("Jury consideration of non-statutory aggravating factors, as long as they relate to the character of the defendant and to the crime he committed, does not violate the Constitution of the United States."), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984).

**14.** Pruett was convicted of capital murder during or subsequent to the commission of rape, now codified at Virginia Code § 18.2–31.

**15.** This argument was not advanced in the petition before this Court, only in arguments against the respondent's motion to dismiss.

petitioner did not deliberate or premeditate, he could not have been convicted of either capital or first degree murder. *See Essex v. Commonwealth*, 228 Va. 273, 322 S.E.2d 216, 220 (1984).

Third, even if the Court took notice of petitioner's claim, it has merit only if there was sufficient evidence to support it. *See Hopper v. Evans*, 456 U.S. 605, 612, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982); *Briley v. Bass*, 742 F.2d 155, 164–65 (4th Cir.1984), *cert. denied*, 469 U.S. 893, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984).

■■■■ Here, both the Virginia Supreme Court and the habeas trial court made explicit findings indicating that Pruett was able to and in fact did deliberate [16] over the rape and killing of his neighbor, Wilma Harvey. There was insufficient support for a diminished capacity defense, in light of Pruett's own confession, the circumstances of the crime, and Dr. Tsao's evaluation. *See Pruett v. Commonwealth*, 351 S.E.2d at 13.

*Claim E: Insufficient Penalty Phase Instructions*

On direct appeal, petitioner challenged only the trial court's refusal to give the jury two instructions he had proffered. *See Pruett v. Commonwealth*, 351 S.E.2d at 9 n. 6. The state habeas petition included all the relevant substantive claims now before this Court under this heading, but claimed ineffective assistance of trial counsel only as it relates to allegations 68–70, and 74–75. *See* State Hab.Pet. at paras. 162–66. It also raised ineffective assistance of appellate counsel. *See* Am.Pet. at para. 222. On collateral appeal, the only cause advanced for the procedural default ruling of the habeas trial court was ineffective assistance of *trial* counsel. *See* Pet. for Appeal at 15.

■■ Thus, all Claim D allegations here are procedurally defaulted, except for the paragraph 67 allegation about the two jury instructions, which was argued on direct appeal and at each level of collateral review.

The instructions refused were as follows:
2A: The court instructs the jury that in order to sentence David Mark Pruett to die in the electric chair, the verdict must be unanimous, and if all twelve jurors cannot agree to death in the electric chair, then the Court shall sentence the Defendant to life in the penitentiary.
2B: The court instructs the jury that in order to sentence David Mark Pruett to die in the electric chair, your verdict must be unanimous, and if all twelve jurors cannot agree, then the court shall impose a sentence as provided by law.

There was no constitutional error in refusing these instructions, because the Constitution does not require that the trial court inform the jury of the ultimate result should it fail to reach a unanimous verdict in a Virginia capital case. *See Evans v. Thompson*, 881 F.2d 117, 123 (4th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990).

Even if the Court were to consider the other Claim E allegations, they must be dismissed as without merit. Cases abound in which similar capital jury sentencing instructions were upheld, against similar arguments. *See, e.g., Clozza v. Murray*, 913 F.2d 1092, 1103–05 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1123, 113 L.Ed.2d 231 (1991); *Peterson v. Murray*, 904 F.2d 882, 889–89 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990); *Briley v. Bass*, 750 F.2d 1238, 1242–46 (4th Cir.1984), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985); *see also LeVasseur v. Commonwealth*, 225 Va. 564, 304 S.E.2d 644, 660–61 (1983) (no duty to give specific

---

**16.** Under Virginia law premeditation or deliberation need exist only for a moment before the actual slaying. It may be inferred from the brutality of the killing, the number of blows inflicted, the physical disparity between the defendant and victim, and the defendant's efforts to conceal the crime or avoid detection. *Clozza*

*v. Commonwealth*, 228 Va. 124, 321 S.E.2d 273, 279 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).

State court findings as to state of mind are presumed correct. *See Mason v. Procunier*, 748 F.2d 852, 853 (4th Cir.1984), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985).

instruction defining or emphasizing mitigation).

■ In any case, the Virginia Supreme Court's independent review of the propriety of the death sentence on direct appeal satisfies the general constitutional requirement that the sentencing jury's discretion be "channeled and limited" to appropriate factors. *Coleman v. Thompson*, 895 F.2d at 146–47.

*Claim F: Prosecutorial Misconduct*

Only a very limited portion of this sprawling claim was presented on direct appeal. Specifically, Pruett noted that the prosecution argued in closing during the guilt phase of trial that defendant conceded guilt during his counsel's voir dire. Pruett argued that the trial court should have granted his motion for mistrial based on that statement, because it improperly told the entire jury panel what defense counsel purposely conceded on voir dire only to some individuals. *See Pruett v. Commonwealth*, 351 S.E.2d at 10–11; Pet. for Appeal at 30–31. Respondent concedes that this argument, raised in paragraph 96 of the current petition, is not procedurally barred.

In his state habeas petition, Pruett raised all the present Claim F allegations. He alleged appellate counsel was ineffective for failure to assign as error all these examples of prosecutorial misconduct. *See* Am.Pet. at para. 224. He did not raise any claim of ineffective assistance of trial counsel, relative to the Claim F allegations.

On collateral appeal, the only cause he claimed for the procedural default on Claim F was the "novelty" exception discussed in *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984),[17] as it related to the Claim F allegations of improper reference to and presentation of victim impact evidence. This of course is not cause for the default as to the other allegations. And, as discussed above, the victim impact challenge is without merit in light of *Payne v. Tennessee*. Accordingly, the only part of

Claim F properly before this Court is the paragraph 96 allegation.

This allegation is without merit, for the reasons stated in the Virginia Supreme Court's opinion on direct appeal. *See Pruett v. Commonwealth*, 351 S.E.2d at 10–11. For that matter, there is no indication in the record that this even invokes a constitutional claim. *See* Brief of Appellant at 30–31 (not raising any constitutional argument).

*Claim G: Ineffective Assistance of Trial and Appellate Counsel*

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which outlined a two-prong test for such claims.

■ First, petitioner must show that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." 466 U.S. at 690, 104 S.Ct. at 2066. Courts must "indulge a strong presumption" that counsel's conduct falls within that range, so as to "eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. at 2065.

■ Second, petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

Petitioner states in reply to the respondent's motion to dismiss that full briefing on the ineffective assistance claims "is premature" at this time. That suggestion has no merit. *Strickland* made clear that the existing record may be adequate to demonstrate the adequacy of counsel's representation; in the alternative, this Court may dispose of the claims on the basis of lack of prejudice. *See id.* at 697, 104 S.Ct. at 2069.

Ineffective assistance claims generally fail on either prong, if counsel is claimed to be ineffective for raising objections or arguments which are found lacking on their

---

17. This case stands for the proposition that cause may exist based on a showing that "the factual or legal basis for a claim was not reason-

ably available to counsel." *Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. at 2645 (citing *Reed*, 468 U.S. at 16, 104 S.Ct. at 2910).

merits. *See Peterson v. Murray*, 904 F.2d at 888–89.

■ As discussed below, petitioner's ineffective assistance claims must fail, under these controlling principles. The Court will first review the evidence put on at the state habeas plenary hearing on these claims. It will then analyze the claims based on this review, accompanied where appropriate by reference to relevant state court findings.[18]

### State court hearing

The most important testimony was that offered by Dr. Tsao and Pruett's counsel.[19]

### Dr. Thomas K. Tsao

Dr. Thomas K. Tsao completed his psychiatric training in 1970. He has conducted forensic psychiatric evaluations since 1973, including evaluations for capital murder cases. He has also evaluated many military personnel, in his role as staff psychiatrist or chief of psychiatry for United States Navy medical centers. Hab. I at 51–52.

Tsao had experience in debriefing and treating several Vietnam prisoners of war, and has evaluated POWs and veterans for what is commonly called posttraumatic stress syndrome ("PTSD"). *Id.* at 52. Such evaluations have taken place in the context of criminal trials, and civil treatment. *See id.* at 53–54.

Tsao was appointed in October 9, 1985, to evaluate David Pruett for the assistance of the court and his counsel at Pruett's trial for the rape, robbery and capital murder of Wilma Harvey. The evaluation had three purposes: (1) evaluation of Pruett's sanity, (2) evaluation of his competency to stand trial and assist counsel in his defense, and (3) whatever else could be done to assist counsel in preparing Pruett's defense. *Id.* at 21–25.

Dr. Tsao discussed his task with Pruett's lead counsel, Moody Stallings, on several occasions. *Id.* at 33–34, 40, 54–55. Among the issues discussed was the legal definition of mitigating circumstances. *See id.* at 34. Stallings gave Tsao several examples of what might be mitigating factors, and Tsao understood that Stallings generally sought "anything that might have in any way presented Mr. Pruett in a better light." *Id.* at 62.

Stallings provided Tsao with "a great deal of material" before the doctor saw Pruett. *Id.* at 40. These materials included a transcript of Pruett's confession, and several police reports, which Tsao read. *Id.* at 40–41, 54–55.

Tsao was impressed when he met Pruett with his "clarity of mind and ability to tell me about his involvement" with the Harvey and McGinnis killings. *Id.* at 41–42. Pruett was "a nice guy," "cooperative," and able to maintain "good eye contact." *Id.* at 55. Tsao found Pruett well oriented as to time, place and person, and otherwise found "no reason to believe that Mr. Pruett was not telling ... the truth about his own social history." *Id.* at 42. Stallings had previously advised Pruett to be "totally cooperative" and truthful with Tsao. *Id.*

Pruett spoke freely with Tsao over approximately two hours about his family history, his going to school, his service in and honorable discharge from the U.S. Army, and working at numerous restaurants after that discharge. *See id.* at 44,

---

**18.** Ineffective assistance claims are mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070. This Court must therefore reach an independent conclusion on these claims, although any state court findings as to historical facts bearing on the claims are presumed correct under 28 U.S.C. § 2254(d). *Clozza v. Murray*, 913 F.2d at 1100.

**19.** Much of the other testimony offered in the hearings covers the same ground. *See* Hab. II at 53–86 (testimony of Pruett's parents), 86–93 (prosecuting attorney), 93–127 (Stallings' co-counsel), 127–141 (medical director for prison

where Pruett kept while awaiting trial), 145–55 (psychiatric social worker at prison).

Dr. Brad Fisher, a clinical forensic psychologist, also testified at length about Pruett's mental state. Fisher summarized what he called "potential mitigating factors." *See id.* at 9–11. He never expressly opined that Pruett has ever been mentally ill or incompetent, or fabricated his confessions, or that he could not have deliberated over the murder of Wilma Harvey. He did acknowledge, "I would see him as—as potentially dangerous in the community." *Id.* at 44.

48. Pruett told Tsao about his two brothers being born deaf and brain damaged. He denied having any psychiatric disorders or problems of his own. *Id.* at 49.

Tsao asked Pruett numerous questions about his medical history. These included questions about allergies, previous surgery, blood pressure, and previous history of head injury or unusual headaches. Other than minor blood pressure, arthritis, and recent minor headaches, Pruett reported nothing extraordinary. *See id.* at 49–50. He did state he was "on drugs and had been drinking" the day he killed Wilma Harvey, however. *Id.* at 56.

Tsao found Pruett's recall, both in general and as tested by a "sixty second recall [test] on three items," to be inconsistent with any theory of organic brain problems. *Id.* at 57–58. Pruett's recall abilities were also inconsistent with any conclusion that he was extremely drunk or high on drugs the night of the killing, or that he was generally so addicted as to render him unable to understand his actions. *See id.* at 58–60.

Other factors inconsistent with organic problems were Pruett's level of formal education, and his apparent ability to hold down jobs and function adequately in the military. *See id.* at 72–75.

Tsao knew Pruett was on medication at the time of the interview. Pruett did not exhibit any disorientation, slurred speech, or other symptoms that would have interfered with the ability to carry out a proper evaluation, however. *Id.* at 71–72.

Although Tsao asked Pruett whether his Vietnam experience might have adversely affected him, he found Pruett to be "rather proud about having served in Vietnam" for four years. Pruett also mentioned that much of his time was spent as a cook, and that this experience helped him obtain employment after his discharge. *Id.* at 63–64. Tsao found no indication of PTSD. *Id.* at 74–75.

In conducting his evaluation and making his report, Tsao specifically considered whether Pruett would be a future danger if left in society, but did not consider his likelihood of future dangerousness in prison. *Id.* at 47–48. His ultimate conclusion that Pruett represented a future danger was based in part on Pruett's frank admission to two "murderously violent" events— the killing of Debra McInnis and of Wilma Harvey. *See id.* at 70.

Tsao could not conclude Pruett was insane or substantially impaired at the time of the crime or the evaluation. He concluded in a written report that "the most appropriate diagnosis for Mr. Pruett would be of an adjustment disorder of adult life with anxious mood (DSM–3 309.24)." *Id.* at 66.

This conclusion was based in part on the fact that Pruett had only reasonable "anxiety" about his plight, and did not behave or respond to questions as one with a substantial psychosis or organic brain problem would have responded. *Id.* at 66–67.

Tsao also concluded that Pruett committed the crimes to fulfill some inner need, and that he "formulated a plan or knew how to carry out [the acts necessary] to fulfill his needs." *See id.* at 70–71.

After the report was prepared, Stallings called Tsao at least four times. Tsao admitted to Stallings he would not be a good witness, because he had been unable to find any substantial mitigating evidence of the type Stallings had sought. *See id.* at 67–69.

*Moody E. Stallings, Jr.*

Moody Stallings represented Pruett at trial and on direct appeal.[20] He began his work on the case with a brief meeting with Pruett, followed by a discussion with the prosecuting attorney about obtaining relevant confession and rights waiver materials. *See id.* at 122–23. It was Stallings' first and only capital case. *Id.* at 124.

His initial approach to handling the case was to concentrate on suppressing Pruett's confession. *See id.* After repeated discussions with Pruett and persons who knew Pruett, Stallings concluded that there was

---

**20.** The record also indicates that he represented Pruett at Pruett's trial for the robbery and murder of Debra McInnis, for which Pruett was also eventually convicted.

no strong support for theories of diminished capacity by way of drugs, alcohol, organic brain disorder or PTSD. *See id.* at 191–94.[21]

Stallings considered the variety of mitigating evidence he might be able to put on during any penalty proceedings. But he grew to believe that putting on weak evidence of Pruett's good character or mental defect could do more harm than good. Stallings felt he "would run the risk there of turning the jury off," in light of the evidence of brutal and calculated rape and murder which the Commonwealth could respond with. *See id.* at 125–26.

Stallings spoke with Pruett's ex-wife on two occasions. She "did not want to be involved," and "offered no help. She said she could not help me. She could only hurt me." *Id.* at 126–27.

Stallings also spoke with Pruett's parents on several occasions, in person as well as by phone. *See id.* at 127, 129. The father "told [Stallings] some disturbing things about David's youth."[22] Stallings decided such matters "would potentially do more harm than good." *Id.* at 128. Stallings could not recall whether he had advised Tsao about these incidents. *Id.* at 129.

Because Tsao would not render any particularly favorable opinions on the issue of Pruett's mental state, Stallings decided to present as much "smoke" on the issue as possible. *See id.* at 135. That is, he decided to (1) make the jury identify with and feel sorry for Pruett's parents, and (2) suggest implicitly to the jury that Pruett had problems like his two brothers, who were born with mental and/or hearing deficits. *See id.* at 130–35.

From interviewing some member of Pruett's family, Stallings discovered that his infant child had died for some unexplained reason, shortly after Pruett's return from Vietnam. Stallings did not discuss this with Tsao. *Id.* at 137.

Stallings' interviews led him to believe that neither Pruett's ex-wife nor Dr. Tsao would offer particularly helpful testimony at any stage of trial. Dr. Tsao's conclusions were especially disappointing, because Stallings understood Tsao to have "extensive experience" as a "defense oriented" psychiatric expert. *See id.* at 144, 163.

Stallings' sworn responses on cross-examination are the most instructive.

Stallings had approximately 6 years experience as both a prosecutor and criminal defense lawyer at the time of Pruett's trial. *Id.* at 156–58. He spoke with Pruett "on a regular basis" once appointed to represent him. *Id.* at 159. Pruett was always rational and concerned for his defense. *Id.* at 159–60.

The day the suppression motion was denied, Stallings consciously switched his focus to the penalty phase. *Id.* at 161–62. Stallings recognized the confession made it easy for the Commonwealth to prove both Pruett's guilt, and aggravating circumstances. *See id.* at 174.

Pruett initially gave no indications of adverse effects of his Vietnam experience. Pruett first raised the issue of PTSD 3–4 months after Stallings had been appointed. He did so after obtaining a copy of some

---

**21.** The following passage from Stallings' testimony virtually eliminates any doubt about Tsao's knowledge of his mission and the difficulty of Stallings' defense:

Doctor Tsao commented on how he hid the murder weapon and the clothes he was wearing after the murder, and I distinctly recall Doctor Tsao commenting that was the sign in his opinion of a man who was thinking very clearly, knew the ramifications of what he had done, and was thinking about the consequences.

Hab. I at 194.

**22.** It is revealing that Pruett's father, who testified during the state habeas hearing, mentioned no particular traumatic incident in David Pruett's childhood. He indicated only that he spent little time with David because of his work schedule and the demands of raising the two younger, deaf and retarded children. He also stated that David was temperamental and began gambling after returning from Vietnam. *See* Hab. II at 58–63.

Pruett's father also acknowledged that he spoke with Stallings several times, and discussed David's life "in some detail" with Stallings. *See id.* at 69–71.

pamphlet on PTSD and Vietnam veterans. *See id.* at 165–66.

Pruett then stated he had killed many people over in Vietnam, including women, and that he had raped and murdered seven Vietnamese women and one Army nurse. *Id.* at 166–68. This conflicted dramatically with Pruett's earlier statements that he was never issued a rifle, and was a cook on a military ship stationed offshore. *Id.* at 167.

Although Stallings recognized such information could have supported a PTSD theory, he thought it dangerous to ask Pruett to testify as to matters which the Commonwealth would of course have argued as simply amplifying Pruett's dangerousness. *See id.* at 171–73. He also discovered no records of Pruett having any combat experience, and found no documentation of an Army nurse killing like the one Pruett described. *See id.* at 189–90.

Given the apparently strong evidence of guilt and aggravating circumstances, and the scant credible evidence of mitigation, Stallings' trial strategy was to gain the jury's absolute trust. This strategy began with voir dire and opening statement, during which Stallings conceded the gruesome nature of the crime at issue. "They were going to hear it sooner or later, [so] I was going to get them conditioned, [to believe] you can still give life even as bad as this situation is." *Id.* at 175–76.

*Analysis*

The functional ineffective assistance claims fall readily into four categories of accusations:

(1) Counsel failed to conduct adequate investigation and follow-up as to evidence he did obtain of Pruett's family stresses, military related trauma, alcohol and drug use and gambling, and the uses he could make of this information during guilt or penalty phases of trial. *See* Pet. at paras. 113, 115–17, 171.

(2) Counsel chose a constitutionally ineffective strategy of (a) conceding the Commonwealth's ability to prove petitioner's guilt and the presence of aggravating circumstances, (b) failing to ask veniremen if they had family members who were handicapped or were substance abusers, which "could have produced" jurors sympathetic to the plight of persons like Pruett, (c) failing to object to physical evidence obtained in a warrantless consensual search of Pruett's house on the ground Pruett was mentally unable to voluntarily waive his fourth amendment rights, and (d) failing to elicit testimony showing that Pruett's confessions to police were involuntary and that Pruett substantially assisted the investigation of the crime. *See* Pet. at paras. 132–59, 165–70.

(3) Counsel failed to adequately discuss the goals of a psychiatric evaluation with Dr. Tsao, provided Dr. Tsao with insufficient information with which to make a competent evaluation, and failed to present appropriate evidence with which to support the motion he made for a second psychiatric evaluation by a PTSD specialist. *See* Pet. at paras. 119–31.

(4) Counsel failed to request jury instructions and a verdict form as described in Claim E, *supra. See* Pet. at paras. 160–64.

Finally, Pruett insists the plenary hearing in state court was not full and fair, apparently because it "did not encompass any claims relating to ineffective assistance of counsel at the guilt phase of petitioner's trial." *See* Pet. at paras. 174–75.

As discussed *supra*, the jury instructions given were proper, and Pruett had no right to the embellishments described in Claim E. Therefore, counsel cannot be deemed ineffective for the Category 4 failures. *See, e.g., Clozza v. Murray*, 913 F.2d at 1103–04; *Peterson v. Murray*, 904 F.2d at 888–89; *Briley v. Bass*, 750 F.2d at 1247–48.

▇ The third part of the Category 3 claims is similarly meritless. *See Roach v. Martin*, 757 F.2d 1463, 77 (4th Cir.) (counsel has no constitutional duty to "shop around for another psychiatrist" who would have made more favorable evaluations), *cert. denied*, 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985).

The record does not support the rest of the Category 3 ineffective assistance claims, or the Category 1 claims. On direct appeal and/or in the state habeas proceeding, there were state court findings that directly contradict these allegations. *See Pruett v. Commonwealth,* 351 S.E.2d at 13–14; State Court Findings of Fact at 7–17.

Even if this Court did not presume such findings to be correct,[23] independent review does not suggest counsel was ineffective.

■ The record indicates that Pruett's counsel spent hundreds of hours on Pruett's defense. Stallings spent many of those hours interviewing or attempting to interview Pruett, Pruett's parents, and Pruett's ex-wife. These people told him nothing to indicate that Pruett's claimed vices or military experience and family life had so traumatized him as to support a credible theory of lack of capacity or mental illness.

Nevertheless, he discussed this information with Dr. Tsao. He sought Tsao's appointment because of the latter's reputation as an experienced and defense-oriented forensic psychiatrist. He told Tsao what he had learned of Pruett's background, and gave him a transcript of Pruett's detailed confession to the murders of Wilma Harvey and Debra McInnis. Stallings also described to Tsao the almost unlimited definition of mitigation, in the context of death penalty cases.

Tsao came to no helpful conclusions. Stallings persisted, however—he kept in touch with him, and suggested that there were perhaps some positive conclusions to be reached as to Pruett's future dangerousness, or lack of mental capacity.

Pruett places great emphasis on the defense strategy's failure to highlight his vices, childhood difficulties,[24] and evidence of PTSD. Of course, there was hardly any evidence to support PTSD, except for some eleventh hour statements from Pruett himself that contradicted military records which counsel obtained. Counsel articulated a reasonable belief that presenting such weak evidence of PTSD or diminished capacity could be more damaging than helpful. *See Woomer v. Aiken,* 856 F.2d 677, 684 (4th Cir.1988) (drug use not commonly viewed as mitigating factor), *cert. denied,* 489 U.S. 1091, 109 S.Ct. 1560, 103 L.Ed.2d 862 (1989). *Compare Stephens v. Kemp,* 846 F.2d 642, 653 (11th Cir.) (counsel ineffective when failing to follow up on information that defendant was in mental hospital shortly before crime), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

■ As to Category 2 claims, they appear facially inadequate. As *Strickland* makes clear, courts should be reluctant to second guess trial lawyers' deliberate tactics. *See Clozza,* 913 F.2d at 1097; *Goodson v. United States,* 564 F.2d 1071, 1072 (4th Cir.1977). Claims of tactical error or failure to object must fail unless the attorney's conduct is actually incompetent and prejudicial. *See Brown v. Dixon,* 891 F.2d 490 (4th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990).

■ A state court finding that an attorney's action reflected tactical choice is entitled to a presumption of correctness. *Evans v. Thompson,* 881 F.2d at 125. Most of the Category 2 claims are foreclosed by this rule. *Evans* also makes clear the Pruett's single conclusory allegation of

---

**23.** Findings regarding defendant's state of mind are presumed correct under 28 U.S.C. § 2254(d). *See Mason v. Procunier,* 748 F.2d at 853. So too are other findings of "historical fact." *See supra* note 18.

**24.** Stallings did put Pruett's parents on the stand during the penalty phase. His mother stated David Pruett exhibited some adolescent problems with stealing and telling the truth, and once physically abused her. She also testified as to the retardation and nerve deafness experi-

enced by their other children. *See* Trial Tr. VI at 1188–91.

David's father added during the habeas hearings that David became moody and prone to gambling upon returning from Vietnam. *See* Hab. II at 61–63. He also discussed the loss of David's child, and his marital problems. *Id.* at 63–66. He could not recall any changes in David's behavior after the death of the child. *Id.* at 66.

ineffective assistance of appellate counsel warrants no relief. *See id.* at 124 (petitioner must overcome "strong presumption" that appellate performance reasonable, and that appellate claims were those counsel believed were most "viable"). The Court does not view this record as allowing petitioner to overcome these presumptions.

Stallings plainly made a choice to get the jury to focus on his own credibility, and on whatever sympathy could be generated for Pruett's parents. He made this choice to blunt the impact of the brutality of the crime, and to avoid any appearance of inconsistent defenses. Each of his actions during voir dire, opening and closing statements were consistent with this approach, which cannot be deemed constitutionally ineffective.

Many of Stallings' remarks and choices here seem even more reasonable and less prejudicial than those at issue in *Clozza v. Murray.*

There, the Fourth Circuit rejected petitioner's claims of ineffective assistance. Those claims were based largely on counsel's statements, which were as blunt as, "If it is my kid [Clozza killed] I would probably want to kill [Clozza]." Counsel also suggested that he was representing Clozza only because he had to, and that nobody would have minded if the defendant's suicide attempt had been successful. *Clozza,* 913 F.2d at 1098 & n. 5.

The Fourth Circuit concluded such statements merely reflected the strategy of maintaining counsel's credibility with the jury. The strategy was reasonable, in light of the overwhelming evidence of Clozza's guilt, and the conflicting evidence as to diminished capacity or other defenses. *See id.* at 1098–99.

Similar factors persuaded the Fourth Circuit that the statements did not prejudice Clozza:

In light of the abundant evidence to support the verdict and inconsistent evidence to support the defenses available, we cannot conclude that the result of these proceedings would have been different had counsel not made the questioned remarks.

*Id.* at 1101.

The allegations classified as Category 2(d) claims deserve some additional comment. There was testimony elicited as to Pruett's cooperation with authorities, and his showing of remorse for the crimes he committed. *See* Trial Tr. III at 862–870, VI at 1181. And, as noted elsewhere, there was no indication of an involuntary confession obtained by coercive police conduct. *See Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

In sum, petitioner has failed to meet his burden as to either prong of the *Strickland* standard. Finally, a word must be said about the "inadequate hearing" argument Pruett offers in passing.[25]

The plenary state hearing lasted two days. It included testimony from Pruett's lawyers, the prosecuting attorney, Pruett's parents, Dr. Tsao, another psychiatrist, and other persons who worked where Pruett was kept pending trial. Many of the "guilt phase" ineffective assistance claims were dismissed before the hearing. But the evidence actually put on certainly addressed issues relevant to all the ineffective assistance claims advanced in the instant petition.[26]

Petitioner has not stated what non-cumulative evidence he would or could put on, if granted another hearing on his ineffective assistance claims in this Court.

He does offer the affidavit of his state habeas counsel, however, suggesting that Stallings and Dr. Tsao testified falsely at the plenary hearing. *See* Aff. of Marshall L. Dayan, Esq. (attached to Petitioner's

---

25. *See also infra* pages 1457–58.

26. Of course, there is nothing inherently wrong with dismissing ineffective assistance claims without a hearing. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. The reason for this is

evident here, where the confession and other evidence made it clear the Commonwealth could prove petitioner's guilt and the presence of aggravating circumstances, even if counsel had offered the conflicting and potentially self-defeating evidence of mental defect or illness.

Reply in Opposition to the Commonwealth's Motion to Dismiss and Brief in Support).

Dayan states that the two offered testimony which materially differed from statements they made to him in discussions before the hearing. He also notes that the state court denied his motion to reopen the plenary hearing. That motion was based solely on the argument that Dayan should have been allowed to treat Tsao as an adverse witness because the Commonwealth paid Tsao $500 for his time in testifying.

▪ Accepting the truth of this affidavit, Pruett still cannot rely on this claim because it was never properly raised before the state courts,[27] and is thus exhausted and procedurally defaulted. *See Teague,* 109 S.Ct. at 1068–69; *Bassette,* 915 F.2d at 937. His counsel's failure to follow proper procedures during the habeas hearing cannot support cause for this default, because there is no constitutional right to effective assistance of habeas counsel. *Coleman v. Thompson,* 895 F.2d at 144.

*Claim H: Right to Plead Guilty but Retain Jury Sentencing*

▪ On direct appeal, Pruett raised this claim only under the guise of a state law claim. Specifically, he argued as follows:

> Counsel is aware that Rule 3A:13(a) of the Rules of the Virginia Supreme Court sets out that "the accused is entitled to a trial by jury only in a Circuit Court on a plea of not guilty." However, pursuant to Rule 3A:18, ... the procedure for the trial in a case of capital murder is governed by Va.Code § 19.2–264.3. Because that statute, in conjunction with the provisions of Va.Code § 19.2–264.4, provides for a bifurcated trial [in capital cases], with a separate hearing on the issue of punishment, Defendant contends that he is entitled to a jury on the issue of punishment alone following a plea of guilty on all charges to the court.

Brief of Appellant at 23.

The Virginia Supreme Court addressed this argument on its terms, and rejected it.

It noted that Rule 3A:18 provides that capital cases shall proceed in accordance with §§ 19.2–264.2 to 19.2–264.5, but that part 3A rules apply to such cases, except to the extent they conflict with the statutes. Because there was no conflict between the Rule 3A:13(a) requirement that jury trial rights exist only to one pleading not guilty, and the statutory provisions for a two-part trial in capital cases, the rule applies and Pruett's argument was without merit. *Pruett v. Commonwealth,* 351 S.E.2d at 8.

▪ Because Pruett first raised this claim as a constitutional one in state habeas proceedings, and never alleged any cause for failure to make the constitutional claim on direct appeal, he is procedurally barred from making the claim here. The Virginia Supreme Court specifically ruled that this claim was entirely defaulted.

Pruett says this is wrong. He contends that his direct appeal did raise the claim under the rubric of federal due process, and that the Virginia Supreme Court's failure to see this makes its procedural default ruling as to this claim clearly erroneous and without merit. *See Smith v. Digmon,* 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978) (per curiam) (claim not unexhausted merely because state appellate court ignores federal constitutional claim squarely addressed in brief); *Daye v. Attorney General,* 696 F.2d at 194 (constitutional claim raised when argument relies on federal or state cases employing constitutional analysis in similar fact situations).

This argument rests entirely on the fact that Pruett's appeal brief cited *Dixon v. Commonwealth,* 161 Va. 1098, 172 S.E. 277 (1934) and *Fogg v. Commonwealth,* 215 Va. 164, 207 S.E.2d 847 (1974).

The former case dealt entirely with the construction of a portion of the Virginia Constitution. It thus failed to even hint at the federal constitutional claims petitioner advances here. Pruett apparently addressed it because of its clear holding that

---

**27.** *See Underwood v. Brown,* 1 Va.App. 318, 338 S.E.2d 854, 858–59 (1986) (holding habeas counsel should have confronted witness with alleg- edly inconsistent statements, even if made to examining counsel).

the Virginia Constitution requires that the court, and not juries, try and sentence defendants upon guilty pleas. *Dixon,* 172 S.E. at 278.

The latter case held the same thing, but admittedly also stated, "There is no constitutional right, either under the Constitution of Virginia or the Constitution of the United States, to a jury trial limited to the issue of punishment of one who has been found guilty of a crime." *Fogg,* 207 S.E.2d at 849.

To the extent this does raise a federal constitutional claim, this Court may refuse to give effect to the Virginia Supreme Court's procedural default finding. However, it is clear in any case that the claim itself has no foundation. *See, e.g., Shaw v. Martin,* 733 F.2d 304, 317 (4th Cir.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 230, 83 L.Ed.2d 159 (1984); *Fogg,* 207 S.E.2d at 849; *see also Coleman v. Thompson,* 895 F.2d at 145–46 (no requirement for jury trial on capital sentencing issues).

*Claim I: Failure to Excuse Venireman for Cause*

At trial, Pruett's counsel sought to have venireman Alfred Friedman excused for cause. When the trial court denied his motion, he was forced to use a peremptory strike on Friedman. The motion was based on the following dialogue:

> Counsel: [I]f you also learned at the sentencing stage that Mr. Pruett had done this before some ten years prior to another helpless victim, do you still feel you could consider giving him life in the penitentiary as opposed to the death penalty. Second murder now. Your are sentencing him on the second.
> Friedman: I would have to struggle at that point.
> Counsel: Okay, sir. Let me take you one further question. Given the fact that he's killed two helpless women, bound, with a knife and that they have both suffered and that he put on no evidence in mitigation of these offenses,
> could you consider life in the penitentiary as opposed to death?
> Friedman: That's a tough question.
> Counsel: These are tough cases.
> Friedman: Yes. I know that. I could consider life, but I would probably lean toward the death penalty.

On direct appeal, Pruett cited only state court cases for the proposition that the trial court abused its discretion in denying the motion to strike for cause. *See Pruett v. Commonwealth,* 351 S.E.2d at 9; Brief of Appellant at 28–29 (citing *Martin v. Commonwealth,* 221 Va. 436, 271 S.E.2d 123 (1980)).

Pruett now[28] focuses this claim on the trial court's alleged application of the wrong constitutional standard in deciding the motion. Specifically, he claims the trial court employed the standard of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which held a juror may be excluded for cause only if he makes it "unmistakably clear" he would automatically vote against the death penalty, instead of the modern standard of *Wainwright v. Witt,* 469 U.S. 810, 105 S.Ct. 70, 83 L.Ed.2d 20 (1985), in which jurors must be excused when their views would prevent or substantially impair the performance of their duties as a juror in accordance with the instructions and his oath. *See Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

Respondent concedes that the claim is viable here to the extent it is identical to the argument advanced on direct appeal. But he contends the claim is defaulted, to the extent it raises the improper constitutional standard argument, thus going beyond the direct appeal argument and appearing to be a partially unexhausted claim which would be procedurally defaulted under Virginia law.

This is a close question. On one hand, petitioner conceded on collateral appeal that the habeas trial court was correct in ruling that the claim repeated the direct

---

**28.** Although Pruett's state habeas petition did not specifically discuss this erroneous standard argument, it did state this claim as based on the trial court's failure "to excuse for cause a venire-man whose ability to perform his function as a juror was substantially impaired." State Hab. Pet. at para. 183.

appeal argument and was thus repetitious and not cognizable under *Hawks v. Cox.* Pet. for Appeal at 30. This supports the suggestion that petitioner's state habeas claim went no further than the direct appeal claim, which never specifically alleged application of an incorrect constitutional standard for excusal for cause.

But the direct appeal argument did state clearly, "It is a basic premise under both Federal and State law that the accused has a right to be tried by an impartial jury." Brief of Appellant at 27 (citing, *inter alia,* U.S. Const. amends VI and XIV). This argument was repeated on state habeas, albeit with more particular reference to the correct constitutional standard. *See supra* note 28. Under such circumstances, it may be appropriate to consider the claim on the merits. *See Picard v. Conner,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Smith v. Digmon,* 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978).

The resolution of the issue hardly matters, because the entire present claim has no merit.

■■ The question of a juror's impartiality is "plainly one of historical fact," and a state court's finding on this matter is entitled to a presumption of correctness on federal habeas review under 28 U.S.C. § 2254(d). *See Patton v. Yount,* 467 U.S. 1025, 1036–37, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). Both trial court and appellate court findings are entitled to such deference. *See, e.g., Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam).

■■ Thus, a state trial court's rulings concerning a juror's fitness to serve are routinely upheld, unless there is no fair support in the record for the ruling, based on the appropriate federal standard. *See, e.g., Boggs v. Bair,* 892 F.2d 1193, 1201–02 (4th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2193, 109 L.Ed.2d 521 (1990); *Briley v. Bass,* 750 F.2d at 1246–47.

■■ The Virginia Supreme Court properly viewed the quoted portion of Friedman's voir dire testimony not in isolation, but in the context of his testimony as a whole. *See Darden v. Wainwright,* 477 U.S. 168, 176, 106 S.Ct. 2464, 2469, 91 L.Ed.2d 144 (1986); *see also Briley v. Bass,* 750 F.2d at 1247 (little weight attached to juror's response to exaggerated hypothetical situation).

It found that Friedman's views, garnered from an examination of all his responses, "would not 'prevent or substantially impair the performance of [his] duties as [a juror] in accordance with instructions of the court and [his] oath.'" *Pruett v. Commonwealth,* 351 S.E.2d at 10 (citing *Clozza v. Commonwealth,* 228 Va. 124, 128, 321 S.E.2d 273, 276 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985)).

There is fair support in the record [29] for this decision, which does invoke the correct constitutional standard. Furthermore, petitioner points to nothing in the record indicating that the trial court in fact applied the wrong constitutional standard.

The following passage indicates the trial court did not apply the wrong standard:

Mr. Stallings: Judge, I would move to strike Mr. Friedman for cause based on [his voir dire]. I feel that he is predisposed towards the death penalty and could not give a fair consideration to life imprisonment.

Mr. Phillips [prosecutor]: Your Honor, predisposition is not the test, and that's not what the juror said.... He indicated ... in response to Mr. Stallings' questions that he could consider life as a proper punishment given all those circumstances. He stated that he would consider it, and he's indicated that he has an open mind with regards to all dispositions, Your Honor, and the Commonwealth submits there is no basis to strike for cause.

The Court: I'm going to overrule your objection, Mr. Stallings.

Tr. I at 280–81. The trial court apparently concluded that Friedman was not predisposed towards the death penalty and that he could give fair consideration to life im-

---

**29.** *See* Trial Tr. I at 266–80 (Friedman's individual voir dire).

prisonment (i.e., the opposite of what Pruett's counsel argued), and that he could consider rejecting a death sentence even under the most exaggerated circumstances described by Pruett's counsel (i.e., accepting the Commonwealth's argument).

*Claim J: Unlawful Confession*

■ Pruett made two statements to police. His first interview, about 90 minutes long, began shortly after midnight and without any Miranda [30] warnings. It was prompted by the discovery of police that Pruett was a good friend of the Harveys, and that his car was parked in front of their home the night before Wilma Harvey's body was found.

Police did give Pruett Miranda warnings, however, after Pruett stated that he had visited Wilma Harvey that evening, but had left about 5:45 p.m. This conflicted with information police had that Pruett's car had been there at least two hours longer. Pruett also signed a waiver stating he understood his rights and was willing to answer questions without a lawyer present. The interview ended and a police detective drove Pruett home. *Pruett v. Commonwealth*, 351 S.E.2d at 3.

Police went to Pruett's home later that day and picked him up for further questioning, because his fingerprints had been found on a pair of eyeglasses worn by Wilma Harvey, and on the headboard of the bed where her body was found. During a 4½ hour, videotaped interview that began about 4:00 p.m. at police headquarters, Pruett confessed both to the rape, robbery and murder of Harvey, and

further confessed to the 1975 robbing and murder of Debra McInnis at a fast food store. This confession followed a police reading of Pruett's Miranda rights, and Pruett's written and spoken waiver of his rights. Pruett was then arrested, placed in handcuffs, and transported to a magistrate. *Id.* at 3–4.

Pruett challenged the admission of the second confession at trial and on direct appeal. The challenge was based solely on alleged violation of Pruett's Miranda rights in the first confession, and the unlawful "taint" that allegedly gave to the second confession. The trial court denied the suppression motion, and the Virginia Supreme Court affirmed. *Id.* at 4–6.

The allegations denominated as J3 and J4 above, claiming Pruett's confession was involuntary and that his mental defect and physical exhaustion rendered his waiver of fifth amendment rights void, were not raised on direct appeal. They were raised in the state habeas petition as paragraphs 200–204, and rejected as procedurally defaulted; the Miranda argument was rejected as repetitious. State Hab.Order at 1. The Virginia Supreme Court also tracked the respondent's arguments on this claim, and held that portions of the claim were not cognizable because repetitious, and other portions not cognizable because procedurally defaulted. [31]

■ Dealing solely with the claim as it invokes *Miranda*, then, there is no merit to petitioner's argument. The record amply supports [32] the conclusions of the trial

---

**30.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**31.** On collateral appeal, Pruett alleged, "To the extent that the claim was not adjudicated on direct appeal, the ineffective assistance of trial and appellate counsel to raise this claim … evades the procedural default." Pet. for Appeal at 30. But this argument was not raised in the state habeas petition; it was therefore procedurally defaulted. Pruett alleges no cause for procedural default in the present petition.

**32.** Of course, suppression decisions must be upheld unless based on clearly erroneous factual findings. *See, e.g., United States v. Wilson,* 895 F.2d 168, 171 (4th Cir.1990); *United States v. Jackson,* 585 F.2d 653, 655 n. 1 (4th Cir.1978).

The ultimate question of whether a confession was made in violation of the Constitution is one for this Court to make independently. *See Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985). But the state courts' findings on "subsidiary questions," such as the length and circumstances of the interrogation and other matters requiring resolution of conflicting testimony, are subject to § 2254(d) deference. *See id.* at 117, 106 S.Ct. at 453.

The record amply supports the subsidiary findings as to the circumstances of the two interrogations, and independent review does not suggest either confession was involuntary. *See generally* 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.2 at pp. 444–449 (1984) (describ-

court and the Virginia Supreme Court that (1) the first interview was not a custodial interrogation, and that (2) even if it was, the technical *Miranda* violation did not taint the second confession because it was "clearly voluntary" and made only after Miranda warnings and explicit waiver of constitutional rights. *See Pruett v. Commonwealth*, 351 S.E.2d at 4–6; *see also Boggs v. Bair*, 892 F.2d at 1198–99; *Rook v. Rice*, 783 F.2d 401, 404–05 (4th Cir.1986), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986). *See generally Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (second confession given after Miranda warnings and waiver admissible even where first given without warnings).

*Claim K: Ineffective Psychiatric Assistance at Sentencing*

■■■ Petitioner did not present this claim in constitutional terms on direct appeal. He did not allege in his state habeas petition the ineffective assistance of trial counsel as cause for failure to do so. Nor did he maintain his claim of ineffective assistance of appellate counsel on collateral appeal. Thus, the claim is defaulted and not subject to review.

This is really just a restatement of Claims B, H, and parts of G, anyway. It is therefore subject to the same analysis, i.e., not a ground for relief because largely procedurally barred, based on new rule which does not support collateral relief, and otherwise without merit.

*Claim L: Unconstitutional to Execute the Mentally Ill*

■■■ This claim is grounded solely on the arguments advanced in Claim B, and upon the affidavit of Dr. Neil Blumberg, submitted in the state trial court habeas proceedings. That affidavit generally states that Blumberg found Dr. Tsao's

evaluation of Pruett unreliable and incompetent. Blumberg apparently believes Pruett required one or more of the following: neurological examination, neuropsychological testing, a general physical examination, or laboratory studies, such as brain or brain wave scans.

Both the habeas trial court and the Virginia Supreme Court held this claim procedurally defaulted under the rule of *Slayton v. Parrigan*. Pruett had contested the trial court ruling as improper, because "[t]his is a jurisdictional claim which cannot be defaulted." Pet. for App. at 32 (citing *Slayton v. Parrigan* );[33] *see also* Petitioner's Reply in Opposition to the Commonwealth's Motion to Dismiss and Brief in Support at 22–23 ("This claim is that no court has jurisdiction to sentence a mentally ill person to death, not that there was some error in the trial or sentencing hearing.").

But this claim is subject to dismissal on the merits however it is viewed.

Pruett supports this claim by citation to a single case, *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[34] There, the Supreme Court addressed the same argument Pruett apparently advances in this claim—that a defendant's mental retardation is sufficient, standing alone, to render his execution a violation of the eighth amendment. A plurality of the Court, in an opinion written by Justice O'Connor, held it is not:

In sum, mental retardation is a factor that may well lessen a defendant's culpability for a capital offense. But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person of Penry's ability convicted of a capital offense simply by virtue of their mental retardation alone. So long as sentencers can consid-

---

ing circumstances in which confessions held involuntary).

**33.** "A prisoner is not entitled to use habeas corpus to circumvent the trial and appellate processes for an inquiry into an alleged *non-jurisdictional defect* of a judgment of conviction." *Slayton*, 205 S.E.2d at 682 (emphasis added).

**34.** Petitioner makes no suggestion that he is actually insane, such as to bar his execution. *See Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *Roach v. Martin*, 757 F.2d 1463, 1474 (4th Cir.1985) (absent evidence of insanity, claimed new evidence of petitioner's having Huntington's Disease would not affect death sentence).

er and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination of whether "death is the appropriate punishment" can be made in each particular case. While a national consensus against execution of the mentally retarded may someday emerge reflecting the "evolving standards of decency that mark the progress of a maturing society," there is insufficient evidence of such a consensus today.

*Penry,* 109 S.Ct. at 2958.

Thus, assuming for the sake of argument that Pruett is as severely mentally retarded as the defendant in *Penry,*[35] this alone is insufficient to hold his death sentence unconstitutional, as long as the jury was not precluded from considering evidence of mental defect as a mitigating factor. *Penry,* 109 S.Ct. at 2946–52; *accord Prejean v. Smith,* 889 F.2d 1391, 1402 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1836, 108 L.Ed.2d 964 (1990); *see also Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (Constitution requires that sentencer "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record … that the defendant proffers as a basis for a sentence less than death.") (plurality opinion, original emphasis); *Buttrum v. Black,* 721 F.Supp. at 1307 (*Penry* forecloses claim that death sentence unconstitutional because defendant "emotionally 12 or 13" at time of crime).

The phrasing of this claim suggests that Pruett contends the jury was unconstitutionally precluded from considering evidence of his mental retardation, by virtue of Dr. Tsao's incompetent assistance. Because the Court is not willing to recognize the validity of Claim B, *supra,* it cannot consider Claim L in this light.

It may also be that Pruett argues his counsel's ineffective assistance unconstitutionally precluded the sentencing jury from considering such evidence. If that is the case, his claim is procedurally barred because it was not raised below, and is without merit in any case.

There was hardly any evidence that Pruett was mentally retarded or otherwise suffered mental defect. *See, e.g., supra* note 35. Furthermore, the Supreme Court has recognized that mental retardation and history of abuse is "a two-edged sword: it may diminish [defendant's] blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Penry,* 109 S.Ct. at 2949. As discussed above, Pruett's counsel made the tactical decision not to present the scant evidence of Pruett's mental defect in an effort to maintain credibility with the jury and to avoid possible negative side effects. *See supra* page 1448 & n. 21. This would seem to be a reasonable decision, which did not prejudice Pruett within the meaning of *Strickland v. Washington. Cf. Woomer,* 856 F.2d at 684 (drug use not commonly viewed as mitigating).

## IV

■ Finally, the Court must address petitioner's related contentions that a motion to dismiss or for summary judgment is not a proper method of disposing of a habeas petition, and that he is entitled to an evidentiary hearing and discovery.

Petitioner points to no cases to support the first argument. Respondent points to two cases which explicitly or implicitly reject the argument. *See Bond v. Procunier,* 780 F.2d 461 (4th Cir.1986) (affirming dismissal of habeas petition despite new factual allegations to support theory that

---

**35.** The petitioner in *Penry,* it should be noted, had "the reasoning capacity of a 7 year old." *Penry,* 109 S.Ct. at 2952.

The state court records establish that Pruett served honorably in the military, graduated from high school, and held numerous semi-skilled jobs. Pruett was responsive and cogent in various settings, including his confession and courtroom testimony. *See, e.g.,* Trial Tr. I at 3;

Tr. of 1/15/86 at 9–13. A medical administrator and a psychiatric social worker who worked with Pruett while he was awaiting trial saw no evidence that Pruett was psychotic or suffered PTSD, organic brain damage, or anything other than the general anxiety expected of a person about to face capital murder charges. *See* Hab. II at 130–34, 140, 148–52.

prosecution did not disclose material evidence); *Briley v. Bass,* CA No. 83–289–R, slip op. (E.D.Va. July 12, 1983) (Warriner, J.) (rejecting argument like that advanced here) *see also Barfield v. Woodard,* 748 F.2d 844, 851 (4th Cir.1984) (affirming summary denial of petition and motion for evidentiary hearing on competency, where "petitioner's forecast of evidence did not suffice to raise a genuine issue.").

 Habeas petitions are routinely decided on the basis of pleadings and examination of the state court proceedings. There is no automatic *right* to discovery or a hearing: this Court need not conduct a hearing if it believes "the state-court trier of fact has after a full hearing reliably found the relevant facts." *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *see also* 28 U.S.C. § 2254(d); *cf.* Rules 6(a), 8(a), 11 of Rules Governing § 2254 Cases (leave of court required for discovery, judge "shall make such disposition of the petition as justice shall require" if it appears no evidentiary hearing required, and Federal Rules of Civil Procedure "may be applied" to permit discovery).

Rule 12(b)(6) of the Federal Rules of Civil Procedure plainly contemplates dismissal of any civil action stating only a legal conclusion (such as the inadequacy of state court proceedings), without supporting factual allegations. Dismissal is also proper if the factual allegations are assumed true, but still state no legal claim for relief. *E.g., Adams v. Bain,* 697 F.2d 1213, 1216 (4th Cir.1982).

 Accordingly, habeas petitioners seeking discovery or federal hearings must allege the *ways* in which the state court fact finding procedures were inadequate. *See Roach v. Martin,* 757 F.2d 1463, 1470 & n. 6 (4th Cir.1985) (petitioner had no right to evidentiary hearing "to redevelop his constitutional claims that the state courts found were without merit," especially where he did not specify which factual findings were inadequate, and which legal conclusions they affected).

It is also appropriate to consider the consistency of petitioner's assertions underlying the claim for discovery. *See id.* at 1471 n. 9 (noting significance of conflicting stories related by defendant to counsel, psychiatrist and police).

 Newly raised allegations of competency or state of mind do not demand discovery or a hearing, where the state court record "clearly supports a finding that [petitioner] vividly recalled the details of the murders and that he was able to distinguish between right and wrong." *Id.* at 1471.

Pruett makes only two reasonably particular allegations about the inadequacy or unfairness of the state court proceedings. These are the alleged false testimony of persons at the plenary hearing, and the state court's summary dismissal of guilt phase ineffective assistance claims before hearing. They are both addressed at the end of the Claim G discussion, *supra.*

## V

For the reasons stated above, the respondent's motion will be granted, the petition will be denied and this action dismissed.